09 - 20665 - CR

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-804-Cr-Altonaga(s)(s)(s)(s)(s)

UNITED STATES OF AMERICA

v.

DIEGO MONTOYA SANCHEZ,
Defendant
_____/

## GOVERNMENT'S FACTUAL BASIS IN SUPPORT
## OF ENTRY OF GUILTY PLEA

Pursuant to Rule 11(b)(3) of the Federal Rules of Criminal Procedure, the United States of America submits the following factual basis in support of the entry of a guilty plea by defendant Diego Montoya Sanchez to Counts 1 and 10 of the Fifth Superseding Indictment.

Count 1 charges the defendant with conspiring to import into the United States five or more kilograms of cocaine, in violation of Title 21, United States Code, Sections 963 and 952(a); all in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B). Count 10 charges the defendant with obstruction of the due administration of justice in the case of *United States v. Diego Montoya, et al.*, Case No. 99-804-Cr-Altonaga, by threats and force, by knowingly and willfully, and with malice aforethought, aiding, abetting, inducing, and procuring the torture and killing of Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil," in violation of Title 18, United States Code, Sections 1503(a), 1503(b)(1), 1111, and 2.

Assistant United States Attorney
Attorney for Defendant
Defendant

This factual basis also will support the defendant's guilty plea to Count 2 of the superseding

indictment out of the District of the District of Columbia in Case No. 04-126 (EGS), which has been

transferred to this District for guilty plea and sentence, pursuant to Rule 20 of the Federal Rules of

Criminal Procedure (and docketed as Case No. 09-20665-Cr). Count 2 in Case No. 04-126 (EGS)

charges the defendant with conspiring to participate in conducting the affairs of an enterprise through

a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(d).

The factual basis for the defendant's guilty pleas in the above-referenced cases is as follows:

1.      The defendant, Diego Montoya Sanchez, was born January 11, 1961, in Trujillo, Valle

del Cauca, Colombia. He is the brother of co-defendants Juan Carlos Montoya Sanchez and Eugenio

Montoya Sanchez and is the cousin of co-defendant Carlos Felipe Toro Sanchez.

## A.      INTRODUCTION: THE MONTOYA ORGANIZATION

2.      Defendant Diego Montoya Sanchez was involved in the cocaine trafficking business

for over two decades. From at least as early as the mid-1980s, through the time of his capture on

September 10, 2007, defendant Diego Montoya Sanchez led a prominent Colombian cocaine

trafficking organization in which members of his family also were high-ranking members. These

family members included:

(a)      the defendant's co-defendant and brother, Juan Carlos Montoya Sanchez, who

was a prominent organization member starting from the days of the organization's inception

and so remained through the time of his arrest on or about December 29, 2003;

(b)      the defendant's co-defendant and brother, Eugenio Montoya Sanchez, who

assumed a prominent role in the organization starting in or around 1991 or 1992, and so

remained through the time of his arrest on or about January 15, 2007; and

Page 2 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

(c)     the defendant's co-defendant and cousin, Carlos Felipe Toro Sanchez, who started assisting the organization in approximately 1993 or 1994 and over time ascended to a high managerial role within the organization, where he so remained through the time of his arrest on or about December 29, 2003.

3.      Where this document references the term "the Montoya organization," it references the cocaine trafficking organization led by defendant Diego Montoya Sanchez and in which co-defendants Juan Carlos Montoya Sanchez, Eugenio Montoya Sanchez, and Carlos Felipe Toro Sanchez all were high-ranking managers.

## B.    THE MONTOYA ORGANIZATION'S HISTORICAL COCAINE PRODUCTION AND TRANSPORTATION METHODS AND PRACTICES

### Colombia's "Norte del Valle" Region

4.      The Montoya organization's drug trafficking activities included operations conducted out of the Colombian department of Valle del Cauca. The largest city in Valle del Cauca is Cali, Colombia, which is in the southern portion of the department. Valle del Cauca also contains a region known as "Norte del Valle." Although the term "Norte del Valle" oftentimes has been translated into English as the "North Valley," Colombia's "Norte del Valle" refers to the northern portion of Valle del Cauca. The remainder of this factual statement will refer to that region by the term "North Valley," which although linguistically imprecise is the English language term most commonly used to refer to that region.

5.      The Montoya organization, along with other organizations operating in and around the North Valley, eventually became part of what has been termed as the "North Valley Cartel." During the time in which what was known as Colombia's "Cali Cartel" was active, traffickers based in Colombia's North Valley served as a source of supply to traffickers centered in Cali, Colombia.

Assistant United States Attorney
Attorney for Defendant
Defendant

Following the decline of the Cali Cartel in the mid-1990s, traffickers based in the North Valley emerged to become Colombia's most prolific cocaine trafficking cartel. Within the trafficking world, the term "North Valley Cartel" has been used to describe the major cocaine trafficking organizations that operated in and around the North Valley. Members of the North Valley Cartel both processed cocaine and exported it to Mexico and the United States. During the course of his over two decade-long participation in cocaine trafficking trade, defendant Diego Montoya Sanchez was the leader of a major North Valley Cartel organization – *i.e.*, the Montoya organization – that produced and exported cocaine to locations in the United States that included the Southern District of Florida.

### The Start of the Montoya Organization as a Cocaine Production Organization

6.      Defendant Diego Montoya Sanchez grew up in the central portion of Valle del Cauca, where his family had successful businesses in coffee farming, cattle farming, and operating a regional bus line. As a youngster, defendant Diego Montoya Sanchez was interested in entering the seminary. Although at one time defendant Diego Montoya Sanchez's father had looked into seminary schools for him, defendant Diego Montoya Sanchez's career ultimately took a different path. In 1975, when defendant Diego Montoya Sanchez was 14 years-old, his father died. To fill the void left by his father's death, defendant Diego Montoya Sanchez began assisting his mother in managing the family businesses. Within a short time, defendant Diego Montoya Sanchez gravitated into the cocaine business.

7.      Some time after the death of the defendant Diego Montoya Sanchez's father, the region where the Montoyas lived began to experience problems with increased guerilla activity. Threats and extortion by local guerilla groups caused extreme financial hardships for many of the small

Assistant United States Attorney
Attorney for Defendant
Defendant

businessmen and landowners in the region. Around this time, many landowners in the region became involved in the cocaine business, which provided both a more lucrative way to make money but also a means to raise capital to fight the guerillas encroaching on their lands.

8.      Defendant Diego Montoya Sanchez first became involved in the cocaine business in approximately the early 1980s, when he started working as a driver and messenger for an associate who operated a local cocaine laboratory. In approximately 1984, defendant Diego Montoya Sanchez enlisted a friend to introduce him to Ivan Urdinola Grajales, who by then was a well-known Colombian cocaine trafficker. After the friend vouched for defendant Diego Montoya Sanchez, Urdinola met with him and agreed to sponsor him in setting up and operating a cocaine laboratory. This started a long criminal relationship in which for a number of years Urdinola was defendant Diego Montoya Sanchez's primary patron within the cocaine trafficking world. Through that criminal relationship, defendant Diego Montoya Sanchez eventually rose to become one of the two leading kingpins in the North Valley Cartel.

9.      As with the other labs that his organization operated, defendant Diego Montoya Sanchez set up his first cocaine laboratory in the North Valley region. Defendant Diego Montoya Sanchez and his brother, Juan Carlos Montoya Sanchez, ran the laboratory and oversaw the different workers. During the decade-long period in which the Montoya organization operated cocaine laboratories, Juan Carlos Montoya Sanchez had primary responsibility for overseeing and operating the laboratories.

10.     In their laboratories, the Montoyas would process cocaine base into cocaine hydrochloride. The Montoyas quickly became proficient in producing cocaine. As a result, Urdinola soon began procuring ever-increasing amounts of his cocaine from them. Although Urdinola initially

Page 5 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

ordered modest quantities of cocaine, such as 50 kilograms at a time, within a short time Urdinola was placing orders of a 1,000 kilograms and more. Defendant Diego Montoya Sanchez and his brother, Juan Carlos, became so productive that within less than a year they were able not only to meet Urdinola's production demands, but also to start servicing production requests from other major traffickers. By the late 1980s, the Montoya organization was producing multi-ton quantities of cocaine for export from Colombia by serving as a significant source of supply for Ivan Urdinola Grajales and other major Colombian drug traffickers Jose Orlando Henao Montoya, Efrain Hernandez, Nelson Urrego, Oscar Uribe, and Juan Carlos Ramirez Abadia, a/k/a "Chupeta."

### The Montoya Organization Expands into Participation in Aviation Smuggling Routes to Mexico

11.     The Montoya organization owned and operated several airplanes to support its cocaine laboratory operations. The Montoya organization would use the planes to fly cocaine base from Peru and locations in Colombia to landing strips that they would operate. The cocaine base in turn would be processed into cocaine hydrochloride at Montoya organization laboratories. Depending upon the size of the plane, the Montoya organization could transport anywhere between 500 kilograms to 1,500 kilograms of cocaine base in a given flight.

12.     The organization's ownership of these airplanes also assisted defendant Diego Montoya Sanchez in expanding into the transportation facet of the cocaine business. From the late 1980s through the early 1990s, defendant Diego Montoya Sanchez would lease his planes to other traffickers to fly loads of the processed cocaine from Colombia to Mexico. The Montoya organization and other North Valley traffickers used airstrips in Valle del Cauca to send the cocaine-laden flights to Mexico. Many of the Colombian airstrips utilized were located on ranches owned or controlled by the Montoya

Page 6 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

organization or other North Valley Cartel traffickers. The processed cocaine flown to Mexico subsequently was smuggled into the United States for further distribution. Once in Mexico, the cocaine generally was smuggled into the United States over land by Mexican smugglers.

13. During the period of time when aircraft was the primary method of exporting cocaine from Colombia, the Montoya organization assisted several major drug traffickers in the air smuggling of cocaine to Mexico. From the late 1980s through the early 1990s, the Montoya organization was primarily a cocaine production organization. Consequently, other traffickers with more extensive experience and connections in the air smuggling facet of the cocaine business assumed greater operational responsibilities over the air smuggling efforts.

14. Because of the strength and quality of his connections with Mexican drug trafficking organizations and his extensive drug distribution network in the United States, North Valley trafficker Juan Carlos Ramirez Abadia, a/k/a "Chupeta," was one of the Montoya organization's primary associates in the smuggling of cocaine to Mexico by air. The Montoya organization also participated in flying cocaine loads into Mexico with major North Valley traffickers such as Eduardo Restrepo Victoria, a/k/a "El Socio," and Luis Hernando Gomez Bustamante, a/k/a "Rasguno," frequently using airstrips in Colombia controlled by these individuals. In participating with other traffickers in flying cocaine loads to Mexico, the Montoya organization oftentimes would receive payment in the form of a portion of the load on the plane. Depending upon the size of the plane used, the smuggled loads generally would range from between 1,000 and 1,500 kilograms of cocaine per load.

Assistant United States Attorney
Attorney for Defendant
Defendant

The Montoya Organization Transitions from
Aviation Smuggling to Maritime Smuggling

15.    Because of the increased success of interdiction efforts against drug trafficking flights

from Colombia to Mexico (which included the seizure of several Montoya-owned planes), by the early

1990s most major Colombian drug trafficking organizations were moving away from air smuggling

and towards maritime routes. Consistent with this trend, in the early 1990s the Montoya organization

discontinued its use of air routes in favor of maritime drug shipments to Mexico and Central America.

From the early 1990s through the time of defendant Diego Montoya Sanchez's arrest in September

2007, the Montoya organization utilized both large ships and go-fast boats on an ongoing basis to

smuggle large amounts of cocaine through maritime routes

16.    Unlike its involvement in the air smuggling of cocaine, the Montoya organization had

much greater operational involvement in the maritime smuggling of cocaine. From the early 1990s

until approximately 1996, the Montoya organization had a maritime smuggling partnership with Juan

Carlos Ramirez Abadia, a/k/a "Chupeta." Ramirez Abadia's role in the partnership largely involved

utilizing his large network of contacts among transporters in Colombia and organizations in Mexico

that would purchase the cocaine. Defendant Diego Montoya Sanchez in turn was responsible for

supplying the cocaine; dealing with the transporters (who were responsible for getting the cocaine to

ports in Colombia and, from there, to ports in Mexico), and dealing with the Mexican organizations

that would receive the cocaine after it arrived. The ultimate destination of the majority of the cocaine

sent to Mexico was the United States.

17.    The Montoya organization would use maritime routes from both Colombia's northern

coast and Colombia's Pacific coast. The routes from Colombia's northern coast would go through the

Page 8 (August 4, 2009)                                          Assistant United States Attorney
                                                                 Attorney for Defendant
                                                                 Defendant

Carribean, with the cocaine destined for ports on Mexico's Carribean coast, such as Cancun. Transporters on these northern routes generally would deploy go-fast boats (also known as "speed boats"). The go-fast boats on these northern routes generally would carry loads in the approximate amounts of 1,000 to 1,100 kilograms of cocaine per load.

18.     The routes from Colombia's Pacific coast would be destined for the Mexican west coast. These routes generally were lengthier than the routes from the northern coast. For the Pacific routes, the Montoya organization frequently contracted for transportation services from the drug trafficking organization of Victor Patino Fomeque and his half-brother, Luis Alfonso Ocampo Fomeque, a/k/a "Tocayo Patino." During the early and mid-1990s, the Patino drug trafficking organization dominated the maritime trafficking of cocaine from the Colombian Pacific port city of Buenaventura to Mexico.

19.     Montoya transporters used a variety of maritime transportation methods when smuggling cocaine out of the Pacific ports. These included larger, slower vessels that could carry between 4,000 and 6,000 kilograms of cocaine per shipment. They also would use larger go-fast boats that could carry as much as 2,500 kilograms of cocaine per shipment. Sometimes the go-fast boats would transfer the cocaine to larger boats part way through the trips. Other times, they would meet refueling boats at pre-set coordinates in the Pacific. Before reaching the Mexican coast, the go-fast boats would transfer the loads to Mexican fishing boats. The crew on the go-fast boats would board the fishing boats and then would abandon and sink the go-fast boats.

20.     In approximately 1996, defendant Diego Montoya Sanchez's partner in these Mexican transportation routes – Juan Carlos Ramirez Abadia, a/k/a "Chupeta" – voluntarily surrendered to Colombian authorities. This required Ramirez Abadia to temporarily assume a lower profile in the

Assistant United States Attorney
Attorney for Defendant
Defendant

drug trafficking world, which in turn necessitated that he discontinue his smuggling partnership with the Montoya organization. The Montoya organization, however, continued its smuggling activities.

21.    Shortly after Ramirez Abadia's surrender to authorities, defendant Diego Montoya Sanchez decided to end his organization's operation of its cocaine producing laboratories. By this time, Montoya organization laboratories could produce as much as 4,000 kilograms per month. Notwithstanding the productivity of his laboratories, defendant Diego Montoya Sanchez decided that the organization would benefit by concentrating on a single speciality. Defendant Diego Montoya Sanchez determined that maritime smuggling, which both was more profitable and required management and oversight of far fewer workers, was the better area on which to focus his organization's resources and attention. As a result, from approximately 1996-97 through the time of defendant Diego Montoya Sanchez's arrest in September 2007, the Montoya organization no longer produced its own cocaine supply, but rather obtained it from third party sources.

22.    Following Ramirez Abadia's surrender, the Montoya organization continued to contract with the Patino organization for transportation services from the Pacific coast. The Montoya organization also worked with the transporters affiliated with the organization of Miguel Solano Duran. After Miguel Solano Duran was murdered in January 2003, several of his key associates continued to work with the Montoya organization. For a brief time starting in approximately 2000 and then starting again in late 2003, the Montoya organization also worked with Pedro Pineda Camargo, a/k/a "Pispi," who operated profitable smuggling routes out of Colombia and Ecuador. Because of deaths, arrests, and infighting between major Colombian organizations, the Montoya organization regularly had to establish relationships with different sets of transporters. Notwithstanding these challenges, through the time of defendant Diego Montoya Sanchez's arrest in September 2007, the

Assistant United States Attorney
Attorney for Defendant
Defendant

Montoya organization continued to maintain a large and effective network of contacts in Colombia and Mexico to assist with the smuggling of large amounts of cocaine into Mexico, followed by delivery to Mexican traffickers, for ultimate importation into the United States.

23.    While large numbers of these loads were successfully smuggled into Mexico and elsewhere, law enforcement intercepted and seized a number of significant loads.  Among these seizures were: (a) two seizures in Spring of 2001 of 6,000 and 12,000 kilograms of cocaine, respectively; (b) a seizure in December 2001 of approximately 9,300 kilograms of cocaine; and (c) a seizure in July 2004 of approximately 2,200 kilograms of cocaine.  Part or all of the seized loads belonged to the Montoya organization.

## C.    MONTOYA ORGANIZATION MONEY LAUNDERING METHODS AND PRACTICES

24.    Another important component of the activities of the Montoya organization was laundering of the proceeds of its cocaine trafficking.  Until approximately 1991 or 1992, defendant Diego Montoya Sanchez and Juan Carlos Montoya Sanchez were responsible for handling the organization's finances.  However, as the profits from Montoya organization drug trafficking increased, the Montoya organization needed to enlist a trusted individual who would be responsible for overseeing the organization's drug finances.  In approximately 1991 or 1992, defendant Diego Montoya Sanchez recruited his brother, Eugenio Montoya Sanchez, to manage organization drug proceeds and oversee investments as part of the family cocaine trafficking business.

25.    As part of his role in overseeing organization financial activities, Eugenio Montoya Sanchez maintained and oversaw stash houses used to store cash drug proceeds on behalf of the Montoya organization.  The Montoya organization often maintained between $18 million and $20

Assistant United States Attorney
Attorney for Defendant
Defendant

D.M

million in cash drug proceeds collectively in its different stash houses around Colombia, sometimes storing as much as between $6 million and $8 million in a single stash house. Cash drug proceeds stored in these stash houses included drug proceeds generated from the activities of the Montoya organization, as well as drug proceeds generated by the activities of other prominent Colombian drug traffickers and held on their behalf. Cash drug proceeds stored in these stash houses generally were in the form of United States currency. Eugenio Montoya Sanchez used organization drug proceeds to pay various expenses incurred by the organization. These included: (a) purchasing laboratory chemicals for Montoya organization cocaine laboratories, as well as laboratories operated by other North Valley Cartel traffickers; (b) purchasing cocaine paste to be processed at Montoya organization cocaine laboratories; (c) paying persons who worked in Montoya organization cocaine laboratories; (d) paying persons in Colombia responsible for transporting Montoya organization cocaine within Colombia, including to ports and other locations from which it was smuggled to Mexico and elsewhere; (e) paying persons who provided security and debt collection services to the Montoya organization; and (f) paying bribes to corrupt officials who assisted the Montoya organization.

26. In addition, Eugenio Montoya Sanchez used Montoya organization drug proceeds to invest heavily in land and other real estate. Rather than deal in currency or traceable financial instruments, the Montoya organization frequently bartered vehicles and property to settle debts with other drug traffickers. The Montoya organization purposely kept to a minimum financial transactions that involved banks accounts in its members' true names.

27. Eugenio Montoya Sanchez also used stored Montoya organization cash drug proceeds to fund outside businesses. These included a Montoya-funded business that obtained and sold computer equipment wholesale in Colombia and elsewhere in South America. In addition, Eugenio

Assistant United States Attorney 
Attorney for Defendant
Defendant