Montoya Sanchez oversaw the laundering of cash drug proceeds through Colombian banks and money exchanges to convert them from United States currency to Colombia pesos on behalf of defendant Diego Montoya Sanchez to finance personal and lifestyle expenses.

### D.   USE OF VIOLENCE BY THE MONTOYA ORGANIZATION TO OBSTRUCT JUSTICE AND TO PROTECT ORGANIZATION MEMBERS FROM LAW ENFORCEMENT EFFORTS

Background to the Murder of Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil": The Relocation of Montoya Family Members to South Florida and the Subsequent Seizure of Montoya Family Property

28.     The Montoya organization also utilized its drug proceeds to support members of the Montoya family. In the late 1990s, the Montoya organization started moving family members to South Florida. Montoya family members who relocated to South Florida in the late 1990s or shortly thereafter included defendant Diego Montoya Sanchez's mother, his sister, his ex-wife, his two sons, an ex-sister-in-law, two nephews, and a niece. Eugenio Montoya Sanchez oversaw the laundering of millions of dollars of drug proceeds to help support the luxurious lifestyles of Montoya family members living in South Florida. The drug proceeds were laundered through shell corporations set up in the British Virgin Islands. Drug proceeds laundered through this method were used to purchase luxury cars and luxury homes for Montoya family members who had been relocated to South Florida.

29.     However, agents of the Federal Bureau of Investigation ("FBI") uncovered this scheme and identified properties funded by Montoya organization drug proceeds. In October 2002, FBI agents seized two luxury condominiums and luxury automobiles from Montoya family members residing in South Florida. Federal authorities subsequently forfeited these properties. The seizures and forfeitures of the Montoya family property, coupled with growing law enforcement pressure from the ongoing

Page 13 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

the ongoing investigation of the Montoya organization, eventually prompted Montoya family members to flee South Florida and return to Colombia.

<u>The Murder of Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil"</u>

30.    Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil," was a long time associate of the Montoya organization. His responsibilities included obtaining and distributing cell phones and pagers for Montoya organization. Garcia Giraldo continued in that role through the time of his death in August 2003.

31.    In June 2003, after learning that Garcia Giraldo was planning to take a trip from Colombia to South Florida, Eugenio Montoya tasked Garcia Giraldo to deliver money to a Montoya family member while Garcia Giraldo was in South Florida. Acting at Eugenio Montoya Sanchez's direction, in June 2003 Garcia Giraldo delivered drug proceeds to the Montoya family member at a location in South Florida.

32.    Sometime in or slightly prior to August 2003, defendant Diego Montoya Sanchez directed Eugenio Montoya Sanchez to meet with a Montoya organization member and instruct the organization member to kidnap and use violence to extract information from Jhon Jairo Garcia Giraldo. Defendant Diego Montoya Sanchez relied upon Eugenio Montoya Sanchez in this regard because of Eugenio Montoya Sanchez's position of trust within the organization.

33.    Defendant Diego Montoya Sanchez feared that Garcia Giraldo was cooperating with United States law enforcement. Defendant Diego Montoya Sanchez directed Eugenio Montoya Sanchez to instruct the organization enforcer to elicit from Garcia Giraldo whether he was cooperating and what he had told United States law enforcement. Defendant Diego Montoya Sanchez's concerns

Assistant United States Attorney
Attorney for Defendant
Defendant

included whether Garcia Giraldo had been cooperating with United States law enforcement when Garcia Giraldo made the June 2003 delivery of drug proceeds to the Montoya family member.

34.     Eugenio Montoya Sanchez conducted the meeting, as directed by defendant Diego Montoya Sanchez.  The subjects of the meeting were to convey defendant Diego Montoya Sanchez's instructions and to develop a strategy to lure Garcia Giraldo to a remote meeting location in such a way that Garcia Giraldo would not suspect that the purpose was to abduct and interrogate him.

35.     Following this meeting, a Montoya organization member contacted Garcia Giraldo and instructed him to meet at a farm in a rural area outside of Cali, Colombia.  Garcia Giraldo agreed, believing that the purpose of the meeting was for him to deliver phones to be used by Montoya organization members.

36.     Garcia Giraldo went to the farm sometime in early August 2003.  After Garcia Giraldo arrived, multiple Montoya organization members proceeded to interrogate and beat Garcia Giraldo. Methods used included hitting Garcia Giraldo with baseball bats in the shins and other parts of the body, holding his head under water, and asphyxiating him with a plastic bag over his head.  At intervals, the beatings let up so that Garcia Giraldo would not go into shock and die before the questioning was over.  During his questioning, Garcia Giraldo admitted only to being briefly detained when traveling to the United States and to being asked about his travel documents in the United States. Garcia Giraldo denied being an informant and insisted that he had not cooperated with United States law enforcement authorities.  The beatings continued, and Garcia Giraldo died at the farm.  After Garcia Giraldo died, the assailants at the farm dismembered his remains and disposed of them in a river.

Assistant United States Attorney
Attorney for Defendant
Defendant

37.     Over the course of its existence, the Montoya organization has used violence in order to protect itself against law enforcement investigations and initiatives.  The Montoya organization, at the direction of defendant Diego Montoya Sanchez and other high-ranking organization members, has used violence in order to extract from individuals information that the Montoya organization believed these individuals may have provided to authorities.  Also at the direction of defendant Diego Montoya Sanchez and other high-ranking organization members, the Montoya organization has killed individuals believed to be threats to the organization.  The Montoya organization has used violence and murder to prevent individuals from passing on information to law enforcement, to punish those suspected of doing so, and to instill fear in others to deter them from doing the same.

38.     The form of violence and interrogation employed on Garcia Giraldo was a technique used by the Montoya organization against persons that the organization feared were cooperating with law enforcement.  Defendant Diego Montoya Sanchez further was aware that once questioning was complete, the subjects of the violence and interrogation were rarely allowed to live.  When defendant Diego Montoya Sanchez directed that Garcia Giraldo be abducted and interrogated for information, defendant Diego Montoya Sanchez understood that the likely consequence was that Garcia Giraldo would be killed.

39.     In 1999, defendant Diego Montoya Sanchez was indicted in the United States District Court for the Southern District of Florida in *United States v. Diego Montoya, et al.*, Case No. 99-804-Cr (hereinafter referred to as "Case No. 99-804").  The charges against defendant Diego Montoya Sanchez in Case No. 99-804 were made public in 2000 and were pending during the time period of the planning of the abduction of Garcia Giraldo and Garcia Giraldo's subsequent murder.  At the time of the planning of Garcia Giraldo's abduction and Garcia Giraldo's subsequent murder, the existence

Assistant United States Attorney
Attorney for Defendant
Defendant

of the charges against defendant Diego Montoya Sanchez in Case No. 99-804 was well-known within the Montoya organization – including by defendant Diego Montoya Sanchez and numerous other significant members of the Montoya organization. Defendant Diego Montoya Sanchez understood that the abduction and murder of Garcia Giraldo had the purpose of: (a) assisting defendant Diego Montoya Sanchez and the Montoya organization as a whole in tracking potential law enforcement activities against them in Case No. 99-804 and other potential prosecutions; (b) retaliating against Garcia Giraldo for his perceived cooperation with law enforcement; (c) preventing Garcia Giraldo from assisting United States law enforcement in the prosecution of defendant Diego Montoya Sanchez in Case No. 99-804, as well as in potential prosecutions of others members of the Montoya organization; (d) instilling fear in others as to the consequences of cooperating with United States law enforcement against defendant Diego Montoya Sanchez and others in the Montoya organization in Case No. 99-804, as well as other potential prosecutions; and (e) thereby deterring them from doing so.

### The Murder of the Brothers of Carlos Jose
### Robayo Escobar, a/k/a "Guacamayo"

40.     The 2005 murders of the brothers of Carlos Jose Robayo Escobar, a/k/a "Guacamayo," serve as another example of the Montoya organization's use of violence to impede cooperation with authorities. Carlos Jose Robayo Escobar was a debt collector and enforcer and long had been a close and trusted Montoya organization operative. In March 2005, Robayo Escobar was arrested by Colombian authorities, and in April 2005 he was indicted as a co-defendant in this case.

41.     Over the course of mid-2005, and while Robayo Escobar was in custody in Colombia pending extradition to the United States, Montoya loyalists started to develop suspicions that Robayo Escobar's brother, Nelson Robayo Escobar, a/k/a "Mamoncillo," was cooperating with authorities.

Assistant United States Attorney
Attorney for Defendant
Defendant



In approximately September 2005, Montoya loyalists murdered Nelson Robayo Escobar, all as well as two other brothers, Diego Alberto Robayo Escobar, a/k/a "Puma," and Jaime Adrian Robayo Escobar, a/k/a "Micoseco." Participants in the killings included co-defendant Oscar Varela Garcia, a/k/a "Capachivo," and co-defendant Gildardo Rodriguez Herrera, a/k/a "Camisa."

### E. THE WAR BETWEEN THE VARELA AND MONTOYA ORGANIZATIONS

Background: The Rise to Power of Defendant Diego Montoya Sanchez and Wilber Varela Within the North Valley Cartel

42.     Over the course of the 1990s, the two dominant wings within the North Valley Cartel were led by the Urdinola and Henao families. The Urdinola wing participated in all aspects of the drug trafficking business, including operating as significant producers of cocaine. The drug trafficking patriarch of the Urdinola family was Ivan Urdinola Grajales, who was defendant Diego Montoya Sanchez's long-time patron in the cocaine trafficking world.

43.     As a trusted cocaine trafficking associate of Ivan Urdinola Grajales, defendant Diego Montoya Sanchez traditionally was most closely affiliated with the Urdinola wing of the North Valley Cartel. Over the course of the 1990s, as his success and prominence within the Colombian drug trafficking world grew, defendant Diego Montoya Sanchez climbed within the power structure of the Urdinola wing. By the time that Ivan Urdinola Grajales died in a Colombian prison in 2002, defendant Diego Montoya Sanchez had become the kingpin of what had been the Urdinola wing of the North Valley Cartel.

44.     The Henao wing likewise participated in all aspects of the drug trafficking business. Throughout much of the 1990s, the Henao wing was led by Orlando Henao Montoya, with his brothers Fernando and Archangel also occupying significant roles. Orlando Henao Montoya's murder in 1998

Assistant United States Attorney
Attorney for Defendant
Defendant

set in motion the rapid decline of the Henao brothers. In December 2001, Fernando Henao Montoya was arrested in Miami. The fall of the Henao brothers was completed in January 2004, when Archangel Henao Montoya was arrested in Panama, from where he was extradited to the United States several weeks later.

45.    As the Henao brothers started to decline from prominence in the late 1990s, Wilber Varela ascended to control over that wing of the North Valley Cartel. Varela was believed to be a former officer in the Colombian National Police. Varela's roots in the Colombian drug trafficking world were as an enforcer within the Henao wing. Over time, Varela rose within the power structure of the Henao wing. By the time that defendant Diego Montoya Sanchez took over what had been the Urdinola wing of the North Valley Cartel, Wilber Varela had elevated to the top of what had been the Henao wing of the North Valley Cartel. By the end of the 1990s, Wilber Varela and defendant Diego Montoya Sanchez were the two foremost kingpins within the North Valley Cartel.

### The Escalation of Tensions Between
### the Varela and Montoya Organizations

46.    For a long time, relations between Wilber Varela and defendant Diego Montoya Sanchez had been tense. These tensions dated back to the murder of Libardo Duque, a/k/a "Payaso," in the early 1990s. Until his death, Duque had been an enforcer for then-North Valley Cartel kingpin, Orlando Henao. Defendant Diego Montoya Sanchez and then-North Valley Cartel kingpin Ivan Urdinola Grajales believed that Duque had targeted defendant Diego Montoya Sanchez for murder. Over the course of its history, the Montoya organization has used violence against rival drug traffickers to prevent perceived threatened attacks and assassinations of organization members and members of their families. In order to preempt a possible attack on defendant Diego Montoya Sanchez, Ivan

Assistant United States Attorney
Attorney for Defendant
Defendant

Urdinola Grajales, with the knowledge and consent of defendant Diego Montoya Sanchez, directed Oscar Varela Garcia, a/k/a "Capachivo," to kill Duque. Oscar Varela Garcia was a long-time enforcer in the Urdinola wing of the North Valley Cartel and, through that association, developed a close relationship with defendant Diego Montoya Sanchez. Oscar Varela Garcia carried out the killing, as directed.

47.     Tensions between the Montoya and Varela organizations started to escalate as the1990s came to a close. North Valley Cartel traffickers who formerly would work freely with a variety of organizations increasingly were forced to pick sides. By way of example, in approximately 2000-01 the Varela organization ordered prominent North Valley Cartel cocaine transportation specialists Eduardo Restrepo Victoria, a/k/a "El Socio," Pedro Pineda Camargo, a/k/a "Pispi," and Jaime Alberto Marin, a/k/a "Beto Marin," to cease offering cocaine transportation services to the Montoya organization.

48.     The animosity between the Varela and Montoya factions progressively spawned significant outbreaks of violence within the Colombian narcotics underworld. In December 2001, Montoya and Varela organization enforcers engaged in a widely publicized shoot-out in a discotheque north of Cali, Colombia. Within weeks, several Varela enforcers who had been arrested in connection with the incident were murdered in a Colombian jail. Starting sometime in 2002, a high-ranking Varela enforcer named Javier Antonio Calle Serna, a/k/a "Comba," mounted an extensive armed initiative in the traditional Urdinola family stronghold in Canon de Garrapatas. Through these efforts, Calle Serna's forces took over large portions Urdinola family land and forced Urdinola family members and loyalists out of Canon de Garrapatas.

Page 20 (August 4, 2009)                              Assistant United States Attorney
                                                      Attorney for Defendant
                                                      Defendant

49.      On January 5, 2003, Varela operatives murdered Miguel Solano Duran at a nightclub in Cartagena, Colombia.  Solano Duran was a longtime and high-level trafficking partner of the Montoya organization, as well as a personal friend of defendant Diego Montoya Sanchez.  The murder of Solano Duran triggered an even further elevation of tensions between the rival organizations.

50.      In July 2003, prominent North Valley Cartel traffickers Juan Carlos Ramirez Abadia, a/k/a "Chupeta," and  Luis Hernando Gomez Bustamante, a/k/a "Rasguno," along with Gabriel Puerta Parra, who was a long-time counselor and facilitator within the Cartel, convened a summit to try to defuse the tensions between the Montoya and Varela factions.  The summit took place at Puerta's ranch in Colombia's Magdalena Medio region, southeast of Medellin and northwest of Bogota.  Defendant Diego Montoya Sanchez and Wilber Varela both attended.  Both were accompanied by a number of their closest associates, as well as numerous armed bodyguards.  Although the summit lasted several hours, it made no progress in defusing tensions between the two factions.

### The War Between the Varela and Montoya Organizations

51.      By the fall of 2003, the hostilities had erupted into an all-out war in which the Varela and Montoya organizations targeted each other's members for murder.  The Varela-Montoya war may have had roots in personal animosities among the different participants that dated back many years.  However, the war ultimately carried a far broader and more sweeping significance within the Colombian narcotics underworld.  The Varela-Montoya war functioned as a battle for dominance within the North Valley Cartel and over its most valued drug trafficking production and export routes.

52.      One of the most significant murders committed in the course of the Varela-Montoya war was the March 2004 assassination of retired Colombian National Police colonel Danilo Gonzalez.  For years, Gonzalez had assisted prominent North Valley Cartel traffickers, including the Montoya

Assistant United States Attorney
Attorney for Defendant
Defendant

organization, by managing an extensive corruption network within the Colombian National Police. As tensions between the Varela and Montoya organizations escalated, Gonzalez aligned himself with the Varela organization.

53.     On or about December 29, 2003, Colombian authorities captured Juan Carlos Montoya Sanchez, the brother of defendant Diego Montoya Sanchez. Gonzalez was blamed for the arrest and as a result was targeted for murder.

54.     On the day of the murder, a Montoya loyalist learned that Gonzalez had left a Bogota law office around lunchtime with a lawyer who worked in the building. A team of enforcers, including Gildardo Rodriguez Herrera, a/k/a "Camisa," positioned themselves at the building that housed the law office. When Gonzalez returned from lunch, enforcers stationed in the lobby ambushed Gonzalez, shooting him repeatedly and killing him.

55.     Another of the more significant murders committed in the course of the war was the murder in Mexico of prominent North Valley Cartel trafficker Pedro Pineda Camargo, a/k/a "Pispi." Prior to 2003, Pineda had been one of the top transporters servicing Varela. A series of events that concluded with Pineda switching loyalties to the Montoya organization resulted in Varela targeting Pineda for murder. In September 2005, Mexican drug traffickers working on Varela's behalf kidnaped and murdered both Pineda and his wife.

56.     The all-out war between the Varela and Montoya organizations continued until approximately October 2005, at which point the organizations entered into an uneasy "truce," with tensions continuing to spark thereafter. The war resulted in hundreds of deaths. Victims included not only members and associates of the two organizations, but also innocent civilians.

Page 22 (August 4, 2009)                                   Assistant United States Attorney
                                                           Attorney for Defendant
                                                           Defendant

57. Over the course of the war between the rival organizations, the Montoya organization, at the ultimate direction of defendant Diego Montoya Sanchez, continued exporting cocaine to Mexico, to be further smuggled into the United States. The Montoya organization funded its war activities through proceeds of cocaine trafficking.

### F. THE CAPTURE OF DEFENDANT DIEGO MONTOYA SANCHEZ

58. On September 10, 2007, Colombian authorities conducted a raid on a ranch in a rural area outside of Zarzal, Valle del Cauca, Colombia. As the Colombian authorities approached the location by helicopter, defendant Diego Montoya Sanchez spotted them and attempted to flee. The arrest team descended by rope from helicopters and searched the ranch and nearby locations. Within an hour, arrest team members found defendant Diego Montoya Sanchez hiding beneath leaves in a creek-bed located approximately 700 yards from the ranch.

Respectfully submitted,

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

By:

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
ph: (305) 961-9027; fax: (305) 530-6168
e-mail: Michael.Davis2@usdoj.gov

I, Diego Montoya Sanchez, agree that above-styled factual basis is true and correct to the best of my knowledge. I confirm that this factual basis has been translated into my native language and that I have read it or that it has been read to me. Because the factual basis set forth above has the limited purpose of supporting my guilty plea to the charges in Counts 1 and 10 of the Fifth Superseding Indictment, the factual basis set forth above does not purport to represent all facts and circumstances

Page 23 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

relating to my participation in these offenses. Similarly, it is my understanding that the factual basis contained above is not intended to identify all knowledge I have of the unlawful activity of other individuals. Accordingly, the facts set forth above do not purport to contain all I know of the unlawful conduct of others with whom I participated or the unlawful conduct of others of which I am otherwise aware.

Date: AUGUST 10, 2009

By: _____
DIEGO MONTOYA SANCHEZ
DEFENDANT

Date: 8-10-2009

By: _____
WILLIAM A. CLAY, ESQ.
ATTORNEY FOR DEFENDANT

Assistant United States Attorney
Attorney for Defendant
Defendant